## HALL v. BLEDSOE.

## Opinion delivered November 6, 1916.

1. STATE—SUIT AGAINST—CHARITABLE BOARD OF CONTROL.—An action brought by the Board of Control of State Charitable Institutions, created by Act 108, p. 403, Acts of 1915, against the superintendent of the State Hospital for Nervous diseases, to oust him from office on account of misconduct, is not a suit against the State.

2. CERTIORARI—REVIEW OF DECISION OF CHARITABLE BOARD OF CONTROL.—Where the Board of Control of State Charitable Institutions sought to remove an officer of the State Hospital, under the provisions of Act 108; p. 403, Acts of 1915, the writ of *certiorari* is available for the purpose of giving the circuit court the opportunity to review the decision of the Board of Control, the Board having acted in a *quasi-judicial* capacity.

3. CERTIORARI—WRIT WILL BE GRANTED, WHEN.—The writ of *certiorari* will be granted where it is shown that the inferior tribunal has exceeded its jurisdiction, and where it appears that it has proceeded illegally and no appeal will lie, or that the right has been unavoidably lost.

4. CERTIORARI—SCOPE OF WRIT—WHAT MAY BE CONSIDERED.—The scope of the writ of *certiorari* at common law, is not enlarged by the Statutes of the State, but under Kirby's Digest § 1316 the court may hear evidence *de hors,* the record for the purpose of possessing itself fully of the matter presented to the inferior tribunal.

5. CERTIORARI—PRACTICE ON HEARING WRIT.—The office of the writ of *certiorari* is merely to secure a review for errors of law, one of which may be the legal insufficiency of the evidence, and for the purpose of testing out that question in the circuit court, and the circuit court may hear evidence *de hors* the record in order to ascertain what evidence was heard by the inferior tribunal, and to determine whether or not the evidence was legally sufficient to sustain the judgment of that tribunal.

6. CERTIORARI—REVIEW OF DECISION OF STATE BOARD OF CONTROL.—In a proceeding to remove the superintendent of the State Hospital for Nervous Diseases, from office, the decision of the Board of Control being against him, the superintendent applied to a circuit judge for a writ of *certiorari* to bring the proceedings of the Board of Control before the court for review. *Held,* the record made at the hearing before the Board should have included all testimony that was offered, whether accepted by the Board or not, and on hearing the writ the circuit court had the right to inquire into all the evidence that was adduced or offered, and had the right to hear other evidence to determine what matters were offered before the Board.

7. CERTIORARI—PRACTICE—AUTHORITY OF COURT.—Where the writ of *certiorari* is limited as at common law, the court is confined in its

review of the evidence to the determination of whether there was substantial evidence to sustain the conviction of the charge.

8.  STATE HOSPITAL—REMOVAL OF SUPERINTENDENT—ACTION OF BOARD OF CONTROL.—The action of the State Board of Control of Charitable Institutions in removing from office the superintendent of the State Hospital for Nervous Diseases, held to be supported by evidence of the superintendent's inattention, and neglect of duty, sufficient to warrant that action, and was a fair exercise of the Board's discretion.

9.  STATE BOARD OF CONTROL—ACTION TO REMOVE SUPERINTENDENT OF STATE HOSPITAL—COMPROMISE AGREEMENT.—The State Board of Control of Charitable Institutions is not bound by an agreement to retain the superintendent of the State Hospital in office, where it appeared that the superintendent was guilty of a neglect of his duties.

Appeal from Pulaski Circuit Court; Second Division; *Guy Fulk*, Judge; reversed and dismissed.

*Wallace Davis*, Attorney General, and *Hamilton Moses*, Assistant, for appellants.

1.   The demurrer should have been sustained. The circuit court was without jurisdiction, because:

A.   The action of the board was administrative and not *quasi* judicial, and therefore not reviewable. 19 Am. St. 88, 94; 62 Ark. 186; 70 *Id.* 589; 61 *Id.* 605; 73 *Id.* 606; 109 *Id.* 100.

B.   The board is created the tribunal to decide as to the necessity of removal of the Superintendent and its finding is not reviewable.   109 Ark. 250; 96 *Id.* 424; 61 *Id.* 497.

C.   This is, in effect, a suit against the State. 70 Ark. 568; 114 U. S. 270; 117 *Id.* 52; 123 *Id.* 443; 172 U. S. 516; 105 Fed. 459; 107 U. S. 711; 91 Ark. 535; 98 *Id.* 528; 102 *Id.* 471-492; 106 *Id.* 177; 108 *Id.* 60.

2.   The motion to require appellee to strike portions of the petition should have been sustained.   59 Ark. 629; 182 S. W. 820.

3.   The court had no power to try the case *de novo.*   5 Rul. C. L., §§ 5, 11, 14.   *Certiorari* does not lie to correct errors or irregularities, and cannot be used as a substitute for appeal; it only lies to correct the lower tribunal when it proceeds illegally or exceeds its jurisdiction.   73 Ark. 606 ; 69 *Id.* 587; 61 *Id.* 605;

62 *Id.* 196; 39 Am. St. 595; 69 N. Y. 408; 10 Mich. 9; 35 Ark. 99; 85 *Id.* 85. It does not lie to review questions of fact to be determined by the evidence outside the record. 11 L. R. A. (N. S.) 940; 20 *Id.* 1175; 24 *Id.* 447.

4. The forms of law were complied with; due notice was given; a fair hearing had, and the testimony sustains the findings of the Board. 84 Ark. 540, 551.

*John M. Moore, Walter H. Pemberton* and *Cockrill & Armistead,* for appellee.

1. There is an entire failure of any substantial testimony to sustain any charge. No official misconduct, inattention, neglect or inefficiency was shown, nor other adequate cause for removal. 23 A. and E. Ency. 442; 106 Ark. 253; 67 *Id.* 156; 90 *Id.* 1; 72 N. Y. 445; 79 *Id.* 582; 55 N. W. 118; 79 N. W. 369.

2. The findings of facts by the board are reviewable and must be supported by the proof · to stand. *Certiorari* is the proper remedy. Act March 18, 1899; Kirby's Digest, §§ 1315-1316; 35 Ark. 99; 43 *Id.* 341; 14 Ark. 337; 52 *Id.* 213. Here there was no appeal as in judicial proceedings. 21 Ark. 264; 44 *Id.* 267; 61 Ark. 605. The common law scope of the writ has been enlarged by our statutes. 6 Cyc. 738; 103 Wisc. 460; 6 Cyc. 826-7; 30 Ark. 148; 33 *Id.* 117; 56 *Id.* 85; 14 N. Y. S. 345; 23 N. E. 1061; 9 S. E. 863; 40 Pac. 264. The finding of the board is not conclusive and the court had power to quash the order of removal upon a finding that it was not sustained by the evidence; second, that evidence *de hors* the record was admissible and that the evidence did not sustain the finding.

3. The action of the board was *quasi* judicial. 84 Ark. 540; 62 *Id.* 186; 70 *Id.* 588; 109 *Id.* 100-105. Hence reviewable on *certiorari.*

4. This is not a suit against the State. 70 Ark. 588; 133 N. W. 857; 109 Ark. 100; 91 *Id.* 538; 36 Cyc. 916; 203 U. S. 335.

5. The compromise agreement was a condonation and estopped the board from renewing the charges. 14 Cyc. 430.

6. The notice was insufficient. 142 N. W. 632; 176 U. S. 398.

McCULLOCH, C. J. The appellants in this case constitute the Board of Control for the Charitable Institutions of the State, and Dr. E. P. Bledsoe, the appellee, is the superintendent of the institution known as the State Hospital for Nervous Diseases. The Board of Control, pursuant to statutory authority, preferred charges against Dr. Bledsoe, and after notice given and a hearing, an order was made removing him from said office. Dr. Bledsoe then applied to one of the judges of the Pulaski Circuit Court for a writ of *certiorari* to bring the proceedings of the Board of Control before that court for review, and on the hearing before the circuit court a judgment was rendered quashing the order of the board, and an appeal has been duly prosecuted to this court. On the hearing of the cause before the circuit court, the record as made before the Board of Control, including all of the oral testimony adduced, was considered, and also appellee was permitted to introduce additional testimony, oral and documentary.

The statutes of the State originally provided that the charitable institutions should be under the supervision of a board of trustees appointed biennially by the governor. The office of superintending physician was created and the duties of the office prescribed in part as follows:

"The superintending physician shall have the power to appoint and remove all subordinate officers and persons allowed by the board of trustees. He shall, at the time of the reception of each patient, enter in a book kept for that purpose the name, age, sex, residence, office and occupation of the person, by whom and by whose authority each insane person is brought to the asylum, and have all the orders, warrants, requests,

certificates, and other papers accompanying such insane person, carefully filed and forthwith copied in said book; he shall also have general superintendence of the buildings, grounds and farms, with their furniture, fixtures and stock, and the direction and control of all persons therein, subject to the by-laws and regulations of the trustees; he shall daily ascertain the condition of the patients, and prescribe their treatment, in the manner prescribed in the said by-laws; and he shall also be required to see that all the rules and regulations for the discipline and good government of the institution are properly obeyed and enforced." Kirby's Digest, Sec. 4186.

The General Assembly of 1915 created the Board of Control to consist of three members to be appointed by the governor, instead of the board of trustees as originally provided. Acts 1915, p. 403, No. 108. The new statute referred to does not enlarge nor otherwise change the duties and powers of the superintendent, but merely changes the management from that of the old board of trustees to the new Board of Control. Section 7 of the new statute reads as follows: "The Board of Control shall have full authority to adopt such rules and regulations for the conduct of its business, and of the affairs of the institutions under its control, as it may deem proper; it may meet at such times and places for the conduct of its business as may seem fit, but must meet at least once each month." Section 8 of that statute contains the following provision: "The board may at any time remove the Secretary, or the superintendent, or steward of any of the institutions, for inattention, neglect, misconduct or inefficiency in the discharge of his duties, or for other adequate cause; but in case of such removal, it shall state specifically and distinctly the ground therefor.

The substance of the charges against Dr. Bledsoe, which we deem it worth while in the discussion to mention, is that he was guilty of inattention and neglect and inefficiency in failing to devote his entire time to the discharge of the duties of the office, and in absent-

ing himself frequently from the institution at times when his presence was required; that he failed to visit and inspect the wards in the institution and to personally familiarize himself with the conditions existing there; and that he failed to hold staff meetings for the purpose of consulting concerning the treatment of patients. There were other charges embraced in the specifications which we do not deem it important to mention. The fact that some of the charges are unsustained does not affect the merits of the controversy with respect to the other charges.

The discussion of counsel in their respective briefs has taken a very wide range, and many questions which we think are well settled are debated with great zeal.

(1) In the first place, it appears clear to us that this is not, as contended by counsel for appellants, a suit against the State. It is merely a review of the proceedings of a tribunal created by the State to perform certain functions, the one exercised in this instance being *quasi* judicial. The rights of the State are in no wise drawn into the controversy, for the proceeding merely raises the question of regularity and correctness of the action of the Board in removing Dr. Bledsoe from the office which he held. The State is not sued, either directly or indirectly. That feature of the discussion may therefore be dismissed without further comment.

(2) Again, it is very plainly settled, we think, that the writ of *certiorari* is available for the purpose of giving the circuit court, a court of general original jurisdiction, the opportunity to review the decision of the Board in removing an officer pursuant to the terms of the statute. *Pine Bluff Water & Light Co.* v. *City of Pine Bluff*, 62 Ark. 196; *State, ex rel.* v. *Railroad Commission*, 109 Ark. 100. "The test, therefore, is," we said in the case last cited, "whether the act sought to be reviewed is done in a judicial or *quasi* judicial capacity, and not merely in a legislative, executive or administrative capacity." It being seen that the Board, in hearing the charges against the superintend-

ent of the hospital, and in removing him, acted in a *quasi* judicial capacity, it follows that a writ of *certiorari* may run for the purpose of bringing up the proceedings for review.

(3) In *Burgett* v. *Apperson,* 52 Ark. 213, this court said: "The writ is granted in two classes of cases, first: where it is shown that the inferior tribunal has exceeded its jurisdiction; and, second, where it appears that it has proceeded illegally and no appeal will lie, or that the right has been unavoidably lost."

More serious questions arise concerning the scope of the inquiry of the court in reviewing the proceedings of the Board. At common law the scope of the remedy was merely to review for errors of law, and the inquiry on the hearing was confined to the record made before the tribunal whose proceedings were sought to be reviewed. Harris on Certiorari, Sec. 59; *Farmington River Water Power Co.* v. *County Commissioners,* 112 Mass. 206; *Morrill* v. *Morrill,* 20 Ore. 96; *Stevens* v. *County Commissioners,* 97 Me. 121; note to the case of *Wulzen* v. *Board of Supervisors,* 40 Am. St. Rep. 35.

The rule is stated in the note referred to above as follows: "No questions can be presented for review upon *certiorari* other than those which arise on the record, save and except that the court may sometimes hear evidence in support of the record for the purpose of showing that substantial justice has been done, or that for some reason the discretion which the court has to deny relief by this writ ought to be exercised and the petitioner left to such other means of redress as he may have, but it is clear in the absence of statutory authority, that the record cannot be contradicted by extrinsic evidence, and that the petitioner's cause must be determined on the record alone. * * * If the evidence received has not been preserved in such a manner as to constitute a part of the record in the lower court, it must be excluded from consideration in the superior court, though the judge or some other officer has certified to it, and thus attempted to make it a part of the return to the writ. In the great majority

of cases in which redress is sought by this writ it is directed to inferior courts or tribunals exercising a limited or summary jurisdiction having no record. In such cases perhaps the most usual practice is to require such court or tribunal, by its clerk or otherwise, to certify the proceedings taken before it and its action thereon, as well as to furnish copies of such petitions and other papers as have been presented to it and made a basis of its right to act, together with a statement of its rulings upon any point in which it is claimed to have acted erroneously to the prejudice of the applicant.''

In Ruling Case Law (Vol. 5, p. 260), we find this statement: ''In many jurisdictions the doctrine is asserted that the office of a *certiorari*, at common law, is only to bring up for review questions of jurisdiction, power and authority on the part of the inferior tribunal; and that the superior court is confined to the simple consideration whether the inferior tribunal had jurisdiction, and whether the proceeding and order was within that jurisdiction, and that, if the superior court finds that the inferior tribunal has not exceeded its jurisdiction, it must not go further and inquire whether the order or judgment complained of was right upon the merits. This statement of the law is, doubtless, sufficiently accurate when considered in connection with the cases in which it is generally made. But the rule is not strictly adhered to. Courts do frequently consider upon a common-law *certiorari*, defects and errors in the proceedings of the inferior tribunal which are not strictly of a jurisdictional nature, and it cannot be gainsaid that questions relating to the regularity of the proceedings, or questions of law which arise on the face of the record, or of the proceedings and orders which are in the nature of records, may be reviewed.''

In the same volume, p. 263, we find the following statement with respect to the particular matter now under consideration: ''In some jurisdictions the courts, restricting the writ to its original common-law office, hold that it brings up for review only the record,

and not the evidence, and hence that they will not look into the evidence at all, but merely inspect the record to see whether the inferior tribunal had jurisdiction, or exceeded it, or proceeded according to law, or, as sometimes expressed, whether the tribunal kept within its jurisdiction, or whether the cause assigned was a cause for removal under the statute. In other jurisdictions it is held that the evidence may be brought up, not for the purpose of weighing it, to ascertain the preponderance, but merely to ascertain whether there was any evidence at all to sustain the decision of the inferior tribunal—whether it furnished any legal and substantial basis for the decision. While in the exercise of this power of removal for cause the proceedings of these bodies are *quasi* judicial and so reviewable by the court, still they are not courts, but essentially legislative and administrative bodies, whose action should be considered in view of their nature and the purposes for which they were organized, and not be tested by the strict legal rules which prevail in trials in courts of law. Therefore, if such a body has kept within its jurisdiction, and the evidence furnished any legal and substantial basis for its action, it ought not to be disturbed for any mere informalities or irregularities which might have amounted to reversible error in the proceedings of a court. To apply any other rule would be impracticable, and disastrous in the extreme to public interests."

Our statute regulating the remedy on *certiorari* reads as follows:

"They shall have power to issue writs of *certiorari* to any officer or board of officers, city or town council, or any inferior tribunal of their respective counties, to correct any erroneous or void proceeding or ordinance, and to hear and determine the same; application for such writ may be made to the court or to the judge thereof in vacation on reasonable notice; and a temporary restraining order may be granted thereupon on bond and good security being given, in a sum to be fixed by the court or the judge in vacation,

conditioned that the applicant will perform the judgment of the court." Kirby's Digest, Sec. 1315.

"Affidavits may be read on such applications, and evidence *de hors* the record may be introduced by either party on the hearing. The record of any such inferior judicial tribunal shall be conclusive as far as the same may extend, but the acts of any executive officer or board of such shall only be *prima facie* evidence of their regularity and legality. The court shall have power in such cases to enforce its judgments by *mandamus*, *prohibition* and other appropriate writs." Kirby's Digest, Section 1316.

It has been expressly held by this court that the scope of the writ of *certiorari* at common law' is not enlarged by the statutes of this State on that subject. *St. L., I. M. & S. Ry. Co.* v. *Barnes*, 35 Ark. 95; *Merchants & Planters Bank* v. *Fitzgerald*, 61 Ark. 605; *Pine Bluff Water & Light Co.* v. *City of Pine Bluff*, 62 Ark. 196.

In the case of *Merchants & Planters Bank* v. *Fitzgerald, supra*, Judge Battle, speaking for the court, said: "According to the well-settled practice in this State the writ of *certiorari* can be used by the circuit court in the exercise of its appellate power and superintending control over inferior courts in the following classes of cases: (1) Where the tribunal to which it is issued has exceeded its jurisdiction; (2) where the party applying for it had the right to appeal, but lost it through no fault of his own; and (3) in cases where the superintending control over a tribunal which has proceeded illegally, and no other mode has been provided for directly reviewing its proceedings. But it cannot be used as a substitute for an appeal or writ of error, for the mere correction of errors or irregularities in the proceedings of inferior courts."

(4) Now, while it is true that our statute has not enlarged the scope of the remedy it has enlarged the power of the court with respect to the method of bringing a case before the court for review. At common law a court was bound by the record made in the inferior

court, but the statute which has just been quoted provides in express terms that "evidence *de hors* the record may be introduced by either party on the hearing." It was the manifest purpose of the Legislature to set aside the common law rule to that extent and to permit the court to hear evidence *de hors* the record for the purpose of possessing itself fully of the matter presented to the inferior tribunal. To give any less effect to this language would be to nullify it altogether.

(5) But it does not follow that the court, on hearing the writ, proceeds *de novo* and tries the case as if it had never been heard in the inferior court. This is true, because as we have already seen, the office of the writ, which has not been enlarged by statute, is merely to review for errors of law, one of which may be the legal insufficiency of the evidence, and for the purpose of testing out that question the circuit court is, by the statute, empowered to hear evidence *de hors* the record in order to ascertain what evidence was heard by the inferior tribunal, and to determine whether or not the evidence was legally sufficient to sustain the judgment of that tribunal. That question is one of law, which is subject to review like all other errors of law. *Callett* v. *Railway Co.*, 57 Ark. 461.

(6-7) The record made at the hearing before the Board of Control should have included, of course, all testimony that was offered, whether accepted by the Board or not, and the circuit court on the hearing of the writ therefore had the right to inquire into all evidence that was adduced or offered, and had the right to hear other evidence to determine what matters were offered before the Board. Learned counsel for appellee concede the correct rule to be that "Where the writ is limited as at common law, then the court is confined in its review of the evidence to the determination of whether there was any substantial evidence to sustain the conviction of the charge" and we are of the opinion that that is the rule applicable to this proceeding under our present statute.

The testimony introduced before the Board was accurately preserved and a transcript furnished. There is no question made about its accuracy. It may be said, too, that the additional evidence heard by the circuit court, even if considered, adds nothing to the solution of the question really presented, whether or not the Board acted arbitrarily and without legally sufficient evidence. That is the real question presented, since we find the law to be that the court cannot in this proceeding review merely for errors of judgment upon legally sufficient evidence, and we proceed to an analysis of the testimony for the purpose of determining whether or not there was evidence of a substantial nature which justified the action of the Board of Control, or whether the removal of Dr. Bledsoe was arbitrarily done and without any justification in fact.

Dr. Bledsoe became superintendent of the hospital on January 1, 1916, and these charges were preferred on June 9, 1916, the hearing being begun the next day. The testimony was undisputed that there were no morning staff meetings held for about thirty days prior to the time the charges against him of inattention and inefficiency were made. It appears that it had long been the custom, and was thought necessary, to hold two meetings of the staff of physicians daily for the purposes of consultation. One of those meetings was held early in the morning, and are referred to as the morning staff meetings, and the other was held about 11:30 a. m., and are referred to in the testimony as the noon meeting. There is testimony to the effect that the morning meetings were the more important ones. At the examination of patients by members of the staff, a stenographer is usually present who takes down everything that is said at the examination, and a transcript of that is furnished so that it may be submitted to the staff at the meetings. Every case is taken up in consultation and the opinion of each physician expressed in the order of seniority, beginning with the superintendent. The reason given by Dr. Bledsoe for not holding these staff meetings for the period

named was that he had insufficient stenographic help. It seems that there were ordinarily three stenographers employed for that work, and two of the places were vacant, one of the stenographers having been discharged by Dr. Bledsoe and the other having resigned. Dr. Bledsoe states that the reason he had not filled those vacancies was that there was so much strife and controversy between him and the Board over the management of the institution that he could not make employments. He admits, however, that there were a number of applicants for the places and that the members of the Board had sent persons out there to apply for the places, but that he considered the applicants inefficient and did not employ them.

The testimony tends to show that Dr. Bledsoe was frequently absent from the noon staff meetings. The physician next in rank to Dr. Bledsoe, who appears not to be unfriendly to him and who was introduced by him as a witness, testified that Dr. Bledsoe was absent from the noon consultations on an average of two days in each week. Dr. Bledsoe denies that statement and says that while he was absent from the consultation room a good many times, he was generally busy in another room at the hospital.

Quite a number of witnesses were introduced— nurses and attendants in charge of the wards—and the testimony tended to show that Dr. Bledsoe very seldom visited certain wards. The testimony shows that during the six months he was in charge he did not visit certain wards more than once or twice, and had no opportunity to ascertain the condition of the wards except through the reports of his subordinates. The testimony shows that he did not interrogate the attendants actually in charge. Many of them testified that he never spoke to them at all. Much of the testimony is to the effect that Dr. Bledsoe's conduct towards the attendants, if not actually uncivil or discourteous, manifested indifference or unwillingness to get acquainted with his subordinates.

Again, there was testimony tending to show that Dr. Bledsoe was absent from the institution a great deal of the time and spent considerable time in the city of Little Rock. One witness, who was an employee at the institution for the purpose of carrying the mail back and forth from the city to the hospital, testified that frequently on his return from the city about ten or eleven o'clock in the morning, and about four o'clock in the afternoon, he met Dr. Bledsoe going towards the city. Another witness testified that frequently he was unable to find Dr. Bledsoe about the premises on important occasions when his presence was desired.

There is a farm connected with the institution, which is in charge of a practical farmer selected by the superintendent. This farm has about 45 acres in cultivation and is operated for the purpose of furnishing vegetables to the institution. The man in charge of the farm testified that Dr. Bledsoe, during the whole six months of his incumbency up to the time of the trial, had never visited the farm and had never given him any directions, except upon one occasion in the office he had spoken about planting some potatoes at a certain place. The witness stated that he had never received any other directions from Dr. Bledsoe and had never seen the latter visit the farm.

The laundry at the institution is quite extensive, and 18 men are employed there, and besides about 40 inmates of the institution are worked. The evidence shows that thirty or forty thousand garments are laundered there per week. The testimony of the man in charge of that department is that Dr. Bledsoe never visited the laundry nor gave any directions concerning its management. The testimony of the engineer in charge of the mechanical part of the institution was that Dr. Bledsoe paid very little attention to that department.

Dr. Bledsoe, in his testimony, gives an account of his management of the institution which is very satisfactory, if his version of the matter is accepted as true, and he is corroborated in all important details by other

testimony, but it cannot, we think, be said that the undisputed evidence shows that there is no foundation for the charges made against him.   There was testimony introduced tending to show that Dr. Bledsoe visited the wards more frequently than is claimed by many of the witnesses who testified, and he says that it was unnecessary for him to visit the wards oftener for the reason that he received frequent reports from his assistants.   But we are unable to say that the Board was not justified in reaching the conclusion that a failure on the part of the superintendent to make frequent visits himself and possess himself with personal knowledge of the management of the wards was not a species of inattention which seriously affected his efficiency.   The same may be said with respect to his conduct in ignoring the presence of those in charge of the wards when he met them and in failing to get acquainted with them so that he would be informed as to their capacity for caring for the inmates of the institution.

Dr. Bledsoe gives what may be deemed a satisfactory reason for his failure to attend staff meetings, but it cannot be said that his reason is one which necessarily must be accepted by the Board charged with the duty of superintending the institution where the helpless wards of the State are kept and treated.   The superintendent was not expected to be a farmer or a laundryman, but the statute makes it his duty to exercise a superintending control over all those departments of the institution, and it was not unreasonable upon the part of the Board to find that he was derelict in discharging his duty by wholly failing to visit those departments.

(8)   We are not called on to decide primarily whether or not the decision of the Board was correct. The lawmakers have placed that authority in the Board of Control, and it would be clearly an encroachment by the courts upon the authority of another department of government to undertake to substitute the judgment of the judges for that of the members of the tribunal vested with authority to manage the insti-

tutions of the State and to appoint and remove those who are placed there in charge. When all the testimony in the case is considered and viewed in the strongest light to which it is susceptible in support of the Board's findings, it cannot be said that there is an entire absence of evidence of a substantial nature tending to establish the charge of inattention and neglect of duty on the part of the superintendent. This being true, it becomes the duty of the courts, upon well-settled principles of law, to leave undisturbed the action of the tribunal especially created by the lawmakers to pass upon those questions. Any other view would make the Board of Control a mere conduit through which a decision on the removal of an unfaithful or inefficient superintendent would be passed up to the courts instead of leaving the matter where the lawmakers have placed it, in the hands of the Board.

(9) There is one other question discussed which we ought to mention briefly, and it is this: It is contended that a few days before these charges were preferred a compromise agreement was entered into between Dr. Bledsoe and the Board whereby he was permitted to continue as superintendent on certain terms specified in the written agreement, and that this operated as a condonation of the offenses involved in the charge. We think it is a sufficient answer to this to say that if the charges were true the Board had no power to bind itself not to proceed towards the removal of the superintendent. We cannot concern ourselves about the motives of the members of the Board further than to look to the testimony to see whether or not the judgment of removal was a fair exercise of discretion based upon legally sufficient evidence.

Having reached the conclusion that there was sufficient evidence to justify the action of the Board, it follows that the circuit court erred in quashing the order. The judgment is therefore reversed and the writ of *certiorari* dismissed.

HUMPHREYS, J., concurs.

HART, J., dissenting. It is with regret that I do not agree with my brother judges in a case of such public importance. As a rule dissenting opinions are of but little value, and need not be written and recorded. Inasmuch as my grounds of dissent would not fully appear from the opinion of the majority, I deem it appropriate to write a dissenting opinion.

It is the settled law of this State that a public officer who has under the law a fixed term of office and who is removable only for definite and specified causes, cannot be removed without notice and an opportunity to make defense to the charges against him. *Lucas* v. *Futrall*, 84 Ark. 540. Many decisions to the same effect are cited in a case note to 12 A. & E. Ann. Cas. 996-7.

In *Miles* v. *Stevenson*, 80 Md. 358, 30 Atl. 646, one of the cases cited, the court said: "It is the utmost stretch of arbitrary power and a despotic denial of justice to strip an incumbent of his public office and deprive him of his emoluments and income before its prescribed term has elapsed, except for legal cause, alleged and proved upon an impartial investigation after due notice."

Mechem on Public Officers, at Sec. 454, in discussing the general question here under consideration, says: "In those cases in which the office is held at the pleasure of the appointing power, and where the power of removal is exercisable at its mere discretion, it is well settled that the officer may be removed without notice or hearing. But, on the other hand, when the appointment or election is made for a definite term or during good behavior, and the removal is to be for cause, it is now clearly established by the great weight of authority that the power of removal cannot, except by clear statutory authority, be exercised without notice and hearing, but that the existence of the cause for which the power is to be exercised must first be determined after notice has been given to the officer of charges made against him, and he has been given an opportunity to be heard in his defense." See also num-

reous cases cited by the Supreme Court of the State of Wisconsin in *Ekern* v. *McGovern*, 46 L. R. A. (N. S.) at pages 828 and 829; Throop on Public Officers, sec. 364.

So it has been uniformly held that when the statute provides that an officer may be removed for specified causes, or upon doing or failing to do some specific act, the board as the body making the removal and declaring the vacancy must first find the existence of the facts which entitles them to make such removal.

For the reason that the power conferred upon the board to remove the superintendent contemplates a hearing and determination of the truth or falsity of the charges, the action of the board is judicial in its nature, and as there is no appeal or writ of error provided in the statute, certiorari is the only remedy which the superintendent had to review the action of the board. In discussing the office of the writ of certiorari in *Pine Bluff Water and Light Co.* v. *City of Pine Bluff*, 62 Ark. 196, Mr. Justice Battle said: "At common law, the writ lies only to review the judicial action of inferior courts, or of public officers or bodies. When the action of the officers or public bodies is purely legislative, executive, and administrative, although it involves the exercise of discretion, it is not reviewable on certiorari. But it is not essential that the officers or bodies to whom it lies shall constitute a court, or that their proceedings, to be reviewable by the writ, should be strictly and technically "judicial," in the sense that word is used when applied to courts. It is sufficient if they are what is termed "*quasi* judicial." It has been held that it lies to review the proceedings of officers and bodies, because they are *quasi* judicial, in the following cases, of supervisors, commissioners, and city councils in opening, widening, altering, or discontinuing public streets and highways," etc. The court further said that our statute (now sec. 1315 of Kirby's Digest) "was not intended to amend the common law by enlarging the office of the writ, but, presumably knowing its office at common law, the legislature adopted it, and made it a part of the code,

as it was of the common law pleading and practice, and thereby intended to authorize the circuit courts by means of it, to review judicial and _quasi_ judicial proceedings of officers, boards of officers, and inferior tribunals, and no other.'' Hence the court held the ordinance under consideration in that case was purely legislative and was not reviewable on _certiorari._ The reason of course, being that to do so would be an enlargement of the writ.

Section 1316 of Kirby's Digest was passed to enable the circuit court to properly exercise the power conferred upon it of reviewing the _quasi_ judicial proceedings of officers and boards of officers. It meant to give either party the right to introduce evidence that might be competent to enable, the circuit court to properly review the action of the board. This is borne out by the concluding part of the section which provides that the acts of any board shall be only _prima facie_ evidence of its regularity. If the lawmakers had intended only to supply the evidence taken or offered before the board, it would likely have provided for a record of the proceedings below by bill of exceptions or other appropriate method. It would not likely have left it to so much a matter of conjecture as the introduction of affidavits and other evidence by the respective parties on the hearing. I am not aware that such an unusual method of supplying the record of what occurred before the board, as the opinion of the majority contemplates, was ever provided for in any other proceeding. The board was given the power under the statute to remove the superintendent for certain specified causes, and could only act after notice to the superintendent and a hearing of the facts. If the board should act without any evidence or contrary to any reasonable view of the evidence, its action is subject to review by the circuit court, and section 1316 was passed to enable the officer on the one hand to introduce evidence tending to show that the action of the board was not characterized by good faith, that it exceeded its jurisdiction, or that its finding was con-

trary to any reasonable view of the facts as they existed; and on the other, to enable the board to show it acted in good faith and that the facts reasonably supported the charges preferred against the officer. Such construction of the statute would not amount to a trial *de novo*, in the circuit court, but would only be an appropriate method of reviewing the action of the board which was not required to make a complete record of its proceedings. It seems to me a strained construction of the statute to say that section 1316 was enacted simply as a means of supplying the record made before the board. It was rather passed to provide a full and comprehensive method of enabling the circuit court to arrive at the facts and properly review the action of the board, and such construction does not in any sense enlarge the scope of the writ of *certiorari*. In short my construction of section 1316 does not tend in any sense to enlarge the writ, but under it, the evident purpose of the act is to provide a method of conducting the inquiry before the circuit court and to enable it to take testimony in order that it may correctly and intelligently review the action of the board.

The opinion of the majority seems to give the finding of the board the same effect and binding force as the verdict of a jury in this court. That is to say, if any witness should testify to a substantial fact and the board should find according to his testimony, its finding must be upheld in the circuit court although his testimony was unreasonable and inconsistent, or that he might be contradicted by numerous credible witnesses. Appellants' counsel have cited the cases of *St. L., I. M. & S. R. Co.* v. *Bellamy*, 113 Ark. 384, to sustain their contention that the finding of the board must be upheld by the circuit court if there is any evidence to support it. I do not regard that case or our earlier cases on the subject reviewed in it as having any bearing whatever on the principle at issue in this case. In that case the court properly held that the legislature has primarily the right to determine whether the public necessity and convenience require the establishment of

a railway depot at a given point, and that having it, could delegate the powers to the railroad commission. There the court held that in cases where the Legislative determination of a question is committed to a board, council, commission or the like, the action of the board or commission is conclusive unless it is arbitrary. The principle was recognized in *Shibley* v. *Ft. Smith & Van Buren Dist.*, 96 Ark. 410, where the court declared that it was a settled principle of law that where the Legislature has created a tribunal for the purpose of ascertaining and declaring the result of an election upon any subject, the decision of such tribunal is conclusive. Again in *Little Rock* v. *Katzenstein*, 52 Ark. 107, the court held that the action of a city council in including property in an improvement district, is conclusive of the fact that it is adjoining the locality to be affected, except when attacked for fraud or demonstrable mistake. This is in application of the rule that the Legislature having delegated to the council the power to fix the boundaries of the district, the finding of the council on the subject committed to it is conclusive. In the case before us, the Legislature could not pass an act making the finding of the board conclusive. The reason as we have already pointed out is that due process of law requires that, in an office having the incidents of a fixed term but subject to be terminated for due cause, or some particular cause, required to be established by proof, the officer shall be notified of the charges against him and have an opportunity to defend before he can be removed. As we have already pointed out, the action of the board in cases like this is judicial in its nature and for this reason is subject to review by the courts, by *certiorari* because no other method of review is provided by the statute. This distinction is clearly pointed out by Judge Battle in *Pine Bluff Water & Light Company* v. *Pine Bluff*, from which I have so liberally quoted above. It will be remembered that in that case the court held that the ordinance under consideration was purely legislative and for that reason was not reviewable on *certiorari*.

Of course I do not think the circuit court should weigh the evidence to decide where the preponderance lies, but I think the finding of the board is subject to review if there is no evidence to reasonably support the charges from any fair viewpoint.

The opinion of the majority says that any other rule than the one adopted by it would make the board a conduit through which a decision on the removal of an unfaithful or inefficient officer would be passed up to the courts. I do not think so. The board had no inherent power of removal. It had only such power as it derived from the statute, and can only exercise that power in conformity with the statute. The superintendent is an officer of the State, and his removal is a matter of serious importance. It would be unfortunate, indeed, if the board had no power to remove an unfaithful or inefficient superintendent. But it would be equally unfortunate to give the finding of the board such binding effect as to enable it to exercise its power of removal in an oppressive and unreasonable manner. As we have already seen the action of the board is judicial in its nature and because it exercises judicial functions its action is subject to the supervision of the courts; and it is thus deprived of exercising its power of removal in an unreasonable manner.

I quote from the opinion of Mr. Justice Mitchell in the case of *State* v. *City of Duluth,* 53 Minn. 238, 55 N. W. 118, 39 Am. St. Rep. 595, as follows: "The sufficiency and the reasonableness of the cause of removal are questions for the courts. Dillon on Municipal Corporations, sec. 252, and cases cited. This has been the settled law ever since Bagg's case, *supra,* and we are not aware of any respectable authority to the contrary. Of course, cases (many of which are cited by respondents) where an officer or body was vested with an absolute power of removal at discretion are not in point.

Upon examination of the charges in this case we are clearly of the opinion that they are not sufficient in law. Considering them as a whole they show on

their face that they were not formulated in a very judicial frame of mind. They read more like a hostile declamation than a calm and deliberate statement of charges with a view to a fair investigation."

What the learned Justice said is peculiarly appropriate to the facts of this case as will be hereinafter seen.

The statute provides that the board may remove the superintendent for inattention, neglect, misconduct or inefficiency in the discharge of his duties, or for other adequate cause. I think the causes for which the statute provides his removal must be found in his officials acts and conduct and affect the proper administration of the office. The charges and evidence must relate to something of a substantial nature directly affecting the administration of the office and affecting the rights and interests of the public.

Having reached this conclusion as to the law of the case, it becomes necessary for me to restate the facts. The majority opinion has omitted certain evidence which I think is essential to a proper determination of the issues. Then, too, the opinion rather contains the conclusion of the judges as to the effect of the evidence than an abridgement of it. Section 4186 of Kirby's Digest prescribes the duties of the superintendent, and evidently contemplates that he shall devote his whole time to the discharge of the duties of the office. His duties are manifold and a certain degree of discretion must necessarily be vested in him to enable him to properly discharge them.

Appellee was elected superintendent by the Board of Control about the first of January, 1916. During the spring the members of the board told another physician, who was a mutual friend of all parties that appellee was a good superintendent and his services were perfectly satisfactory.

Another witness testified that he had a conversation with one of the members of the Board about the efficiency of appellee, and the member said he regarded appellee as the best man in the State for the position.

Early in May, 1916, the Board called appellee in and handed him a paper demanding that he remove certain members of his staff and appoint other persons, named by them, in their places, and also that he discharge certain other employees. Appellee asked the members of the Board if they had any charges to make against him personally and was told they had not. The members of the Board and appellee went to the Governor's office and discussed the matter, and the latter insisted upon the changes suggested by the Board being made. No charge of misconduct was made against any of the persons whose removal was demanded. Appellee refused to make the changes suggested by the Board and by the Governor. After several conferences the Board asked appellee to resign, and upon his refusal preferred charges against him, which were served on him at 11:30 of the night of May 25, 1916, to be heard the next morning at 10:00 o'clock. The charges were substantially as follows:

1.  Absenting himself from the Institution.
2.  Failing to visit and inspect wards.
3.  Permitting autopsies.
4.  Failure to consult with Board with reference to the employment and discharge of employees.

Through the efforts of mutual friends of the Governor, the members of the Board and of appellee, a compromise was effected on May 29, 1916. No record was made by the Board of these charges or their dismissal. It appears that the dissension between the Board and Dr. Bledsoe created a spirit of unrest among the employees and caused some confusion in the management and conduct of the institution. Dr. Bledsoe testified that to allay this, he made the compromise, believing that by so doing he was acting for the best interests of the institution. The members of the Board told mutual friends both before and after the compromise that they had no complaints against appellee personally, and were satisfied with his administration of the office, but that he must make the changes in his staff and other subordinates suggested by them.

Subsequently there was another quarrel between appellee and the Board because appellee refused to discharge certain members of his staff and certain other employees. Appellee refused to make the changes in his staff and other employees as demanded by the Board. At six o'clock in the afternoon on June 6, 1916, charges were again preferred against appellee and he was notified to appear and answer them the next morning at 10 o'clock. The charges are in substance as follows:

1. Failing to devote his whole time to the duties of the office.

2. That he had absented himself from the institution when it was his duty to be there.

3. That he had failed to visit and inspect the wards as often as his duty required.

4. That he had failed to hold meetings of his staff as his duty required.

5. That he had illegally permitted autopsies to be held.

6. That during the past few weeks he has used his position to prejudice the people of the State against the Board and the Governor.

7. Charged with official misconduct in giving to the press his correspondence with the Board concerning the first disagreement between the Board and appellee.

Counsel in their brief for the Board do not argue that there is any testimony to support charges numbered 1, 2, 6 and 7; but inasmuch as reference has been made in regard to one of them in the majority opinion it has been deemed proper by me to also refer to them as being explanatory of the motives that actuated the Board in making the charges. In regard to charges numbers 6 and 7, it may be said that during the month of May when the first quarrel was had, certain letters passed between appellee and the Board which were published in the newspapers. In regard to charge No. 1, the evidence shows that appellee on one occasion, by permission of the Board went to Batesville, Ark., on Saturday night and was back at his post on Monday

morning. That on another occasion, he went to Pine Bluff, leaving at 3 P. M., and returning next day. He was, also absent for one week in New Orleans. His absence at New Orleans was by permission of the Board, and was to attend a convention where it was thought he would gather some new and useful ideas in regard to running institutions of this kind. This was all the evidence on these charges and of course counsel abandoned them.

In regard to charge No. 2, one of the inmates of the hospital testified that he carried the mail to and from the city and worked at the telephone during the noon hour. That he usually got back from the post-office about 10:30 or 11 o'clock A. M., and 4 o'clock, P. M. That he had been doing this for three months. That he quite frequently met Dr. Bledsoe going away from the hospital as he returned. That he would frequently have telephone calls for him at the noon hour when he was not there. That sometimes he would meet him going away about 4 o'clock in the afternoon. Dr. Bledsoe, himself, gave a reasonable explanation of his absence. He said that it was frequently necessary for him to go to the State Capitol to consult the Board about obtaining supplies or to be down town on the same business. He also stated he has on a few occasions been absent on personal business or to go to a picture show with his family. This is all the testimony on this charge contained in the record and it furnished no ground whatever for dismissal. The undisputed evidence shows that no autopsies were made except in cases where no one claimed the body and an autopsy was necessary to determine the cause of the death of the deceased. The body was then interred in the same manner as other unclaimed bodies where no autopsies were held. The majority opinion does not even mention this charge and I only mention it as tending to show the Board was seeking any charge that might afford it a legal cause for removing appellee. It was not shown that the Board even objected to autopsies being held, or asked appellee not to hold

them. This leaves for our consideration the only two charges that were pressed by the counsel for the Board to sustain its action in removing appellee, to-wit: Failing to attend staff meetings and to visit the wards. These are the charges relied upon by counsel to sustain the action of the Board in removing Dr. Bledsoe. In regard to the first, it may be said that the evidence shows that Dr. Bledsoe did not attend certain meetings of his staff during the month preceding his removal by the Board. It will be remembered that a quarrel commenced between Dr. Bledsoe and the Board about the first of May because he would not discharge his staff and other employees at the request of the Board. The hospital was divided into wards for the purpose of receiving patients, and certain members of the medical staff were designated for each ward. The incoming patient was mentally and bodily examined by the physician whose duty it was to receive him. A stenographer was assigned to the physician whose duty it was to examine the patient and his duty was to take down the result of the examination. A certain number of stenographers were employed for that purpose. After the quarrel between the Board and appellee, beginning May 1, 1916, the stenographers quit or were discharged. So during the month of May while the dissension was hot between the Board and Dr. Bledsoe satisfactory stenographers could not be employed. The matters taken down by the stenographers were the basis for the staff meetings which were held for the purpose of determining the particular mental disease of the patient and to better enable them to be treated. Dr. Bledsoe testified that during this time it was impossible to employ satisfactory stenographers and that it would take about a month to train to the work steno raphers who could be employed. His testimony on this point is not contradicted. It is reasonable and consistent and there was no reason to disregard it unless testimony tending to disprove it was introduced. Dr. Bledsoe's private office adjoined the room in which the staff meetings

were held, and on several occasions he did not go into the room where the staff meetings were held because he was engaged in other duties pertaining to the institution, having arranged with his chief assistant to call him in at any time that his presence was required. The only remaining question is whether or not he visited the wards as often as necessary. The testimony on this question is as follows:

There are over two thousand patients in the Hospital and thirty-seven wards. The testimony of nine nurses shows that Dr. Bledsoe seldom visited their wards. Their testimony is contradicted by the records which are required to be kept on this matter, and also by Dr. Bledsoe who testified that he visited the wards where his presence seemed to be most required, and that he spent his whole time in the discharge of his official duties. That the only time he was absent was when he went to see the members of the Board about supplies or occasionally to take his family to see a moving picture show. There are 37 wards in the institution. Dr. Bledsoe is only charged with having failed personally to visit seven of them. He has eight assistants. It is admitted in the record that they faithfully performed their duties. It was their duty to visit the wards to which they were assigned and this it is conceded was done by them. It is also conceded that their duties were performed in an efficient and faithful manner. Every ward was visited one or more times each day by some member of his staff. On account of the number of wards and the number of patients in each ward, Dr. Bledsoe could not visit every ward each day and attend to his many other official duties. Hence he visited more frequently the wards where his presence seemed to be more needed. As to the 30 other wards it is not pretended that he did not visit them as often as necessary. Hence Dr. Bledsoe could not be discharged for failing to visit these wards. As a makeshift it is shown that he did not visit the laundry. It was the duty of Dr. Bledsoe to see that this department was conducted as the law

requires. The man in charge of the laundry testified that Dr. Bledsoe never visited his department. He does testify, however, that he conducted it as it ought to be and reported to Dr. Bledsoe. It will be remembered that there was a quarrel for nearly a month before charges were preferred. It seems from the record that the only complaint against Dr. Bledsoe was that he had not visited the laundry. It seems that the laundry was conducted as it should have been done and Dr. Bledsoe should of course not be discharged on that account. Dr. Bledsoe himself testified that he kept a general supervision over the farm and laundry.

There is an amount of ground around the institution which is planted in vegetables. It is shown that Dr. Bledsoe did not personally superintend the growing of the vegetables therein. The farmer designated to manage this branch of the institution testified that the farm was conducted as it ought to be and his only complaint was that Dr. Bledsoe did not personally superintend it. I do not understand the record to show that many of the attendants testified that Dr. Bledsoe never spoke to them at all or that much of the testimony is to the effect that Dr. Bledsoe's conduct towards the attendants was uncivil or discourteous. There is some testimony to the effect that Dr. Bledsoe was rude to some of his employees. He says that he is near-sighted and did not intend so to be. His rudeness unless it extended to illegality of conduct or to oppression under color of office is not ground for removal. This is so because the temperament of people is different. An apparent incivility may be due to poor eyes, to a preoccupied mind, or to a variety of other unintentional causes on the part of the person charged with being rude or discourteous, or it may be the result of prejudice, imagination or a variety of other causes on the part of the person alleging incivility. It must be remembered that the quarrel between the Board and Dr. Bledsoe commenced about the 1st of May. That it arose on account of his refusal to discharge certain members of his medical staff and other

subordinates on the demand of the Board.   That this quarrel continued until the compromise was affected during the latter part of the month, and that it was revived again in a week or so, when Dr. Bledsoe refused to make all the removals demanded by the Board. I think that a careful consideration of the whole record and a judicial review of it leads to the conclusion that whatever inefficiency resulted from not holding staff meetings or the lack of doing other things which had been regularly done before resulted from the unwarranted demands of the Board of Dr. Bledsoe and that the causes of removal designated in the statute could not result from a situation or condition caused by the Board itself making unwarranted demands on Dr. Bledsoe.   Each time charges were preferred against Dr. Bledsoe, he was given only a few hours' notice to appear and defend against the charges.  It may be seriously doubted if sufficient notice was given him to meet the charges but I make no point on that.   I only mention this in connection with the other facts to show that the Board did not act in a very judicial frame of mind; and that the charges did not eminate from minds desirous of exercising calm and deliberate judgment in investigating them.   I think the whole matter resulted from the quarrel in regard to the removal of certain members of the medical staff and other subordinates and that the evidence as disclosed by the whole record did not afford any reasonable ground for the action of the Board in removing Dr. Bledsoe.

I am authorized to state by Mr. Justice Wood that he concurs in this dissent.