504

ARK. RACING COMMISSION *v.* HOT SPRINGS KENNEL CLUB, INC.

5-2177                                                    339 S. W. 2d 126

Opinion delivered October 3, 1960.

[Rehearing denied November 7, 1960]

*Conway & Webber,* for appellant.

*Warren & Bullion,* by *Eugene Warren,* for appellee.

JIM JOHNSON, Associate Justice. The question for decision is: Did the Racing Commission act contrary to

the law and the evidence in cancelling the temporary franchise of the Hot Springs Kennel Club, Inc.?

A general review of the events leading up to the cancellation of appellee's temporary franchise will, we believe, lead to a better perspective of the issues here involved. Very briefly they are as set out below.

March 8, 1957, Act 191 of 1957 (Ark. Stats. §§ 84-2801 to 84-2842) was approved, authorizing dog racing in Arkansas under the supervision of the Arkansas Racing Commission.

December 6, 1957, the Hot Springs Kennel Club, Inc., was incorporated. Eleven days thereafter the articles of incorporation were amended to issue 500,000 shares of promotional stock.

February 6, 1958, the Kennel Club filed with the Racing Commission its application for a temporary franchise. It was known by everyone at that time that dog racing would first have to be approved by the electors in Garland County.

On May 6, 1958, an election was held. It was not known whether the results of the election were favorable to dog racing until the decision of this court became final on May 20, 1959—holding that dog racing had been approved.

By July 1, 1959, it had become known that there were disputing factions existing in the Kennel Club. The directors appeared before the Commission where these disputes were examined by the Commission. Ned Stewart, as chairman and spokesman for the Racing Commission, warned the Kennel Club that it must get its house in order or their franchise would be revoked.

On August 12, 1959, it appearing to the Commission that the Kennel Club had not heeded the warning of the Racing Commission, the Kennel Club's temporary franchise was revoked.

On September 4, 1959, after the Kennel Club had requested a hearing, a full hearing was held before the

Racing Commission, and the revocation was sustained and made permanent.

Following the revocation, the Kennel Club filed a petition for a Writ of Certiorari in the Circuit Court of Pulaski County. Upon that hearing before the Circuit Court the record made before the full Commission on September 4th was reviewed, and the order of the Racing Commission (revoking the temporary franchise) was reversed. From that decision of the Circuit Court an appeal is now prosecuted by the Racing Commission.

*The Judgment of the Circuit Court.* This judgment was based on two propositions, both of which we think were erroneous. One, the order of the Commission is void because no notice was given to the Kennel Club. Two, the order of the Commission was void because it amounted to the taking of the Kennel Club's property without due process of law.

*One.* While it is true that the revoking order issued on August 12, 1959, might be subject to the charge that no notice was given, however, it must be remembered that some 40 days previously the Kennel Club was warned that it must set its house in order or its franchise would be cancelled. The record reflects aboundingly that this warning was not complied with. Regardless of whether the above amounted to notice, it is undisputed that a full hearing was held on September 4, 1959, at the request of the Kennel Club. At this hearing a voluminous record was made, containing the testimony of officers of the Kennel Club and specific findings by the Commission. This record was the basis of seeking redress in the Circuit Court and it is the basis of this appeal. Appellee has had its day in court with ample notice.

*Two.* What we have said above also refutes the finding of the Circuit Court that property was taken from the Kennel Club without due process of law. It is well recognized by all authorities that a franchise granted by the State to conduct dog racing, just a franchise to sell liquor, is a privilege and not a property right. The State

gives the privilege and it can take away that privilege by the same token. In this instance it appears from the record that the Kennel Club had spent approximately $70,000 at the time its temporary franchise was revoked. This, of course, does constitute a loss of money by the Kennel Club, however, Ark. Stats. § 84-2826 (A) makes it very clear that if the law is not complied with the Kennel Club could have its franchise cancelled after it had spent approximately a million dollars. The Kennel Club had access to ''due process of law'' when it had a full hearing before the Racing Commission, before the Circuit Court, and now before this Court.

However, regardless of the reasons assigned by the trial court for reversing the Commission, it still remains to be considered whether the Commission was justified, under the law and the facts, in cancelling the temporary franchise. The several arguments presented by appellee to sustain the judgment of the Circuit Court in reversing the order of the Commission are included under the following groupings: (a) The franchise could be revoked only for one of the causes contained in the statutes and, in the alternative, (b) the testimony given at the hearing did not justify the Commission in revoking the temporary franchise.

(a) We cannot agree that the temporary franchise could be revoked only for one of the two causes mentioned in the statute. The statute referred to is Ark. Stats. § 84-2826. In substance, this statute provides that the temporary franchise *shall* be *forfeited* if appellee fails to acquire a site and commence construction of buildings and facilities within 90 days after notification of the result of the election. It further provides if such construction is begun and appellee fails to complete it and be open for business within one year after the end of the aforesaid 90 day period, in accordance with the plans and specifications, the Commission *shall cancel* the temporary franchise. In the first place it will be noted, and we think it is significant, that in these instances the Commission has been given no discretion. To so limit the power of the

Commission to cancel a temporary franchise would make it an automation, and would not be in harmony with other provisions of the dog racing statute. Ark. Stats. § 84-2819, which defines the power and duty of the Commission, among other things, provides that the Commission shall "hear and determine all matters properly coming before the Commission, and grant rehearings thereon. Take such other action, not inconsistent with law, as it may deem necessary or desirable to supervise and regulate, and to effectively control *in the public interest,* Greyhound Racing in the State of Arkansas." (Emphasis supplied.)

It is not disputed that the Commission has the right and duty to investigate thoroughly in selecting the character of people who propose to conduct dog racing before a temporary franchise is issued. This is in line with the Commission's duty to protect the public interest. If, after the Commission had selected proper personnel and had issued a temporary franchise, the personnel should be changed to include undesirable characters, it would be almost ridiculous to say that the Commission was powerless to revoke the franchise. To accept appellee's contention in this matter would amount to eliminating all distinction between the words "temporary franchise" and "permanent franchise", and would leave the Commission powerless to protect the public interest.

(b) *Was the Commission Justified by the Evidence.* Having arrived at the conclusion that the Commission has the power to exercise discretion, we now proceed to consider whether or not it was justified in this instance in revoking appellee's temporary franchise. However, before proceeding to this discussion it is necessary to determine the rule by which the Circuit Court must review the findings of the Commission on a Writ of Certiorari.

If the Circuit Court in this instance was authorized and empowered to try the issue *de novo,* this fact would lend support to an affirmance of its judgment reversing the Commission, but even then, we think, it would not be a justification. However, the Circuit Court in this instance had no right to try the case *de novo.* In the case of

*Merchants & Planters Bank* v. *Fitzgerald,* 61 Ark. 605, 33 S. W. 1064, among other things, said: "but it does not follow that the court, on hearing the writ, proceeds *de novo* and tries the case as if it had never been heard in the inferior court . . . the office of the writ . . . is merely to review for errors of law." See also *Hall* v. *Bledso,* 126 Ark. 125, 189 S. W. 1041; *Dixie Downs, Inc.* v. *Arkansas Racing Commission,* 219 Ark. 356, 242 S. W. 2d 132, and *North Hill Memorial Gardens* v. *Hicks,* 230 Ark. 787, 326 S. W. 2d 797. In the *Hicks* case the Cemetery Board, pursuant to Act 250 of 1953, issued a permit to one Russell to construct and maintain a cemetery near North Little Rock. Aggrieved parties applied to the Chancery Court to enjoin Russell. Following a hearing the Chancellor revoked the Board's permit. On appeal this Court reversed the Chancellor and in doing so approved this rule: "It has been uniformly held by this Court that where Boards are lawfully appointed and charged with the duty to investigate and determine certain facts, the court cannot substitute its judgment for the judgment of the Board, and the judgment of the Board provided for the purpose of ascertaining the facts is controlling unless there is evidence that it was *arbitrarily exercised.*" (Emphasis Supplied) In addition to the above, this Court in that same case also said: "The burden of proving that the Board's action in granting appellants' permit was arbitrary rested on the appellees." In applying the above announced rules to the case under consideration, it is in order to see whether the Commission was justified by the testimony in revoking the temporary franchise. This question we now proceed to examine.

A careful reading of the voluminous testimony taken before the Commission on September 4, 1959, reveals, in substance, the following situation with reference to the Kennel Club at the time of the hearing. When the application for a temporary franchise was filed February 6, 1958, the Kennel Club had been incorporated. The application showed that among others the directors included Charles S. Harriman, Alex T. Jamieson and Milan S. Creighton.

It developed later that these were the main promoters of the organization. Included among the directors also were J. O. Bennett of Lonoke, Leo Kuhn of Texarkana, W. P. Davis of Newport, James J. Dowds of Hot Springs, J. Bruce Streett of Camden and Jim Evans of Hot Springs. It is noted here that the last six directors later resigned or were deleted from the board, and their testimony in this connection will be set out later. It was stated in the application that two million shares had been authorized and that sufficient stock had been sold to promote the purposes of the corporation.

It appears further that a stockholders meeting was held in December 1951, (prior to the filing of the application) at which time, and after objections, the directors authorized the issuance of 500,000 additional shares (of which one-half carried no voting privileges) for promotional purposes. *None of this was shown in the application* which was filed February 6, 1958. Following that the election was held resulting in an appeal to this Court. Almost immediately after the decision of this Court became final, the latter part of May 1959, authorizing dog racing, there was another meeting of the Board at which time there arose the controversy which resulted in the action of the Commission. At this meeting it seems that four promoters, headed by Creighton, wanted the Board to give them 59,000 additional shares for promotional purposes. The promoters refused to tell the other members of the Board exactly the reason for this additional stock. In somewhat hazy phraseology, Creighton contended that it was necessary to pay promotional expenses. Also, at this meeting there was a proposal to hire Mr. Harriman at a salary of $18,000 per year plus an *unlimited expense account*. The controversy that arose over these and other matters apparently caused the removal of the above mentioned six directors, and it apparently brought on and engendered much litigation which finally resulted in a warning from the Commission on July 1, 1959, that if things were not straightened out the Commission would revoke the temporary franchise. A summary review of the

testimony given at the hearing is sufficient, we think, to justify the action of the Commission.

*J. O. Bennett.* Mr. Bennett testified that when Mr. Creighton approached him about stock in the Kennel Club that he asked Mr. Creighton ''. . . if this was going to be for the benefit of the people of Arkansas, and be governed by the people of Arkansas, and he assured me it was, and I said in a case like that I will be glad to go along with you, but if it's going to result in two or three hogging it up, and be in court like this West Memphis track, then I didn't care to get into it.'' He said that Creighton assured him that he and Mr. Harriman would take approximately 20% of the entire issue to promote the deal. He further stated that: ''We find now that there was very little stock that had been used for promotion.'' Q. ''Now what was the purpose in asking for the additional 50,000?'' A. ''Something they promised somewhere, they wouldn't tell us. We asked if they would give us the names it was going to and they wouldn't give us the names.'' Bennett further testified that he objected to hiring Mr. Harriman at $18,000 a year plus an unlimited expense account. He also stated: ''Personally I can't go along with that and I will resign and you can get someone in my place . . . and that is the last meeting I attended.'' The witness stated that he still owned 5,000 shares of stock for which he paid $2,500, although his name apparently did not appear on the books (a partial explanation of this was offered).

*BRUCE STREETT.* This witness has 5,000 shares of stock for which he paid $2,500. He testified, ''I do not agree with the policies of Mr. Creighton and Harriman . . . and very openly and perhaps rather bluntly expressed my disagreement.'' He stated that he was testifying merely because he had been given a subpoena, and that he held no ill will toward anyone. Mr. Streett further stated that he was astonished when Mr. Creighton first made the proposition that he and the other three promoters wanted 500,000 shares. He stated that when Creighton first talked to him about it he asked him this question: ''Creighton, is the thing going to be eaten up

with a lot of promotional stock which happened in West Memphis, or is it to be operated by Arkansas stockholders and controlled by Arkansas people, and he assured me only a nominal amount of organizational or promotional stock would be required.'' He further stated that Creighton told him that the stock would be worth a minimum of $2.00 per share shortly after it got on the market. Witness stated that this would give the four promoters a million dollars and that he ''thought it represented a rather high price tag on the value of the services of these men.'' In speaking of the stockholders meeting, the witness said: ''Some changes were made in the minutes. I never attended a stockholders meeting, but at that time I said, according to my memory, the minutes of the stockholders meeting did not speak the truth . . . '' Witness further stated that according to his recollection, ''Mr. Creighton said that that stock was to be voted for not only services rendered up to then, but services they would continue to render, these four men, in carrying through the election period and any litigation which might follow . . . '' Streett is no longer a member of the Board.

*JIM EVANS.* This witness' testimony was similar to that given by Mr. Streett. He also owned 5,000 shares of stock for which he paid $2,500. He likewise objected to the issuance of 59,000 shares of stock to the four organizers for promotional purposes, and is no longer on the Board.

*LEON KUHN.* This witness owned 5,000 shares of stock for which he paid $2,500, and likewise objected to the issuance of the promotional stock and particularly the extra 59,000 shares heretofore mentioned. In speaking of what occurred at one of the directors meetings the witness had this to say: ''Well, of course, there was some discussion . . . and then something come up there about we need some more stock to be issued to take care of some things we had to do to get this thing done and, of course, that's when I hit the ceiling and a few more of us in the same bunch sitting on that side of the table hit the ceiling, and that's what brought the fly in the ointment,

and from then on step by step it went from bad to worse."
Kuhn is no longer a member of the Board.

*RICHARD W. HOBBS.* This witness was originally
the attorney for the organization and was paid $5,000 for
his services. He stated that when he filed the application
on February 6, 1958, for a temporary franchise that he
made it out like Mr. Creighton told him to, and no mention
was made of promotion stock. He testified that the applica-
tion stated that: "The present stockholders have pur-
chased and fully paid for a sufficient amount of stock so
as to enable the corporation to proceed with its corporate
purpose and by agreement no stock will be sold to anyone
other than the original stockholders unless the original
stockholders do not fully subscribe to all of the authorized
issue. In any event whatever stock remains unsold will be
offered to the citizens of Arkansas." In speaking of the
directors meeting the witness stated that: "Mr. Creighton
was then questioned as to why they had used such a small
proportion of the half a million shares when they were
supposed to use the stock and why they in turn used the
corporate cash rather than the stock in getting the election
over and for promotional purposes, and they had no expla-
nation other than they had used that much and that was
all." In speaking of what occurred at the directors meet-
ing, the witness further stated: "I told them I didn't want
to have any part of that (referring to promotional stock).
I had rather not even listen to it, and I asked to be excused,
and I left the room." Q. "Well, why didn't you want to
know?" A. "I will say I think I discussed it with Mr.
Streett at the time and I told him I didn't like the smell of
it."

Mr. Creighton testified at length and although he was
pressed to do so he failed to give the Commission any
explanation of what use he had made of the promotional
stock or the money paid into the corporation by the stock-
holders relative to the expense of the election and the liti-
gation. The record reveals that over $50,000 had been paid
for stock and that less than $11,000 was in the treasury.
Also, this appears in his testimony: Q. "Mr. Creighton,

there has been some litigation filed against this Kennel Club with which the Commission is familiar. Let me ask you this, what percentage of the stock does your group represent?" A. "Our group represents in excess of, I believe it's in excess of 90 per cent; might be 1 or 2 points either way, but approximately."

So the picture before the Commission was that Creighton and his group, who were supposed to have 20% of the stock to get the "show on the road" now has 90% of the stock, and the treasury is nearly depleted; large sums of money had been and were still to be expended for suspicious and unexplained purposes, and; the activities of Creighton and his group were such that some of the original stockholders felt obliged to sever their connections with the Board even at the risk of losing the money they had invested.

In view of that picture, this Court is unable to say the Commission acted arbitrarily or even that it acted against the weight of the evidence. Consequently the judgment of the Circuit Court should be, and it is hereby reversed.

GEORGE ROSE SMITH and ROBINSON, JJ., dissent.