## ARKANSAS STATE MEDICAL BOARD *v.*
### Dr. J. Byron GRIMMETT

5-5461                                           463 S. W. 2d 662

Opinion delivered March 1, 1971

*Warren & Bullion,* for appellant.

*John M. Fincher,* for appellee.

CARLETON HARRIS, Chief Justice. This appeal comes from the action of the Pulaski County Circuit Court in reversing and setting aside an order of the Arkansas State Medical Board which suspended the license of J. Byron Grimmett a physician of Waldo, to practice medicine. Grimmett had been charged with acts of unprofessional conduct, including charges that he aided and abetted an unlicensed person to practice medicine, violated the laws governing the possession and distribution of amphetamines and barbiturates, and laws relating to the possession and distribution of narcotic drugs. Grimmett, appellee herein, was also charged with failing to possess the moral character requisite for the proper practice of medicine. After a lengthy hearing, the board found appellee guilty of the acts with which he was charged, and suspended his license to practice. The following provision concludes the order:

"Grimmett may, at the next regular meeting of the Board, present any relevant evidence to the Board which he believes may cause the Board to reconsider its action and reinstate his license. This hearing should not be closed at this time, but should be continued subject to the request of Grimmett or his attorney to appear before a subsequent regular meeting of the Board and present other evidence."

A Petition for Review was filed in Pulaski Circuit Court. After reviewing the evidence, that court made *inter alia* the following findings pertinent on this appeal:

"3. That a cursory weighing of the proof indicates that there was substantial evidence to warrant the action of the Board in suspending petitioner's license but a careful and considered examination of the evidence convinces that the Board should have warned and admonished the petitioner in the areas upon which the Board predicted its order; that such warning and admonition was justified and would have been proper; and that such warning and admonition would have been sufficient instead of the harsh, severe and drastic action taken which deprived the community in which he practiced of acutely needed medical services. * * *

5. That Ark. Stats. 5-713 provides that a reviewing court can stay enforcement of the Board's order and can reverse the Board's action on such terms as may be just."

The court then found that it would be unjust to continue the suspension of appellee's license to practice medicine and surgery while the issues are being litigated, and accordingly reversed the order of the Arkansas State Medical Board, restoring Dr. Grimmett to all the rights and privileges of a duly licensed physician, subject however to the following provision.

"It is further CONSIDERED, ORDERED AND ADJUDGED that said restoration of the right to prac-

tice medicine shall be subject to the following conditions: That Dr. Grimmett shall not maintain any stock of any drug the use and possession of which is subject to regulation under the Arkansas Uniform Narcotic Drug Act, the Arkansas Drug Abuse Control Act, nor shall he maintain any stock of drugs which are designated as 'legend' drugs under the Federal Food Drug and Cosmetic Act. This condition shall not be interpreted to prevent Dr. Grimmett from maintaining a supply of emergency drugs for his personal office use provided said supply does not exceed the amount of emergency supplies normally stocked by non-dispensing physicians."

From the order so entered, the Arkansas State Medical Board brings this appeal. It is first contended that there was substantial evidence to support the order of the board and the court erred in reversing that order.

In *Bockman v. Ark. State Medical Board,* 229 Ark. 143, 313 S. W. 2d 826, this court said:

"The appellant contends that the board's findings of fact are not sustained by any substantial competent evidence. Upon this point it is our rule in proceedings like this one that the board's action will not be set aside on certiorari unless there is an entire absence of substantial evidence to sustain the findings, in which case the board's action is deemed to be arbitrary. [citing cases]"

In *McCain, Labor Commissioner v. Collins,* 204 Ark. 521, 164 S. W. 2d 448, a case involving misconduct of a Supervisor of the Security Division of the State Labor Department, this court quoted from *Hall v. Bledsoe,* 126 Ark. 125, 189 S. W. 1041,[1] as follows:

"We are not called on to decide primarily whether or not the decision of the board was correct. The law-

[1]This case dealt with an action instituted by the Board of Control of State Charitable Institutions against the Superintendent of the State Hospital for Nervous Diseases, seeking his ouster for alleged misconduct.

makers have placed that authority in the board of control, and it would be clearly an encroachment by the courts upon the authority of another department of government to undertake to substitute the judgment of the judges for that of the members of the tribunal vested with authority to manage the institutions of the state and to appoint and remove those who are placed in charge. When all the testimony in the case is considered and viewed in the strongest light to which it is susceptible in support of the board's findings, it cannot be said that there is an entire absence of evidence of a substantial nature tending to establish the charge of inattention and neglect of duty on the part of the superintendent. This being true, it becomes the duty of the courts, upon well-settled principles of law, to leave undisturbed the action of the tribunal especially created by the lawmakers to pass upon those questions. Any other view would make the board of control a mere conduit through which a decision on the removal of an unfaithful or inefficient superintendent would be passed up to the courts instead of leaving the matter where the lawmakers have placed it, in the hands of the board.''

That language is likewise *apropos* in the case now before us. Accordingly, let us examine the evidence to determine if it is of a substantial nature.

Dr. Grimmett was charged with a violation of Ark. Stat. Ann. § 72-613 (Supp. 1969), it being asserted that he was guilty of aiding and abetting Pat Kimbell, an unlicensed person, to practice medicine. Two persons, in addition to Dr. Grimmett, testified to facts pertinent to this charge. Sgt. Bruce Atkinson, Supervisor of the Narcotic and Dangerous Drug Bureau of Arkansas State Police, testified that he visited the Grimmett Clinic at Waldo on three occasions. On August 8, 1969, he went there and talked with Mrs. Pat Kimbell, who appeared to be in charge. The sergeant, who used the name of Dale Henry Attwood, told her that he was from out-of-state and desired to purchase some diet pills. He said he kidded with Mrs. Kimbell about what he wanted diet

pills for, and she said that the doctor was not there, but she could handle anything he wanted; that she was taking care of the medicine and pills and that the doctor would sign a prescription later. The witness stated that she first took his blood pressure, saying that the doctor had so authorized her; that the reading was 160 over 100, and Mrs. Kimbell stated that this was too high to permit him to purchase amphetamines. He replied that he had been drunk at a party and Mrs. Kimbell said that would account for it, and went ahead and made the sale to him. He purchased a bottle containing thirty pills which were later identified as Dexamyl spansules. On leaving the clinic, he sealed the drugs and marked them as evidence. The pills were turned over to the Arkansas Food and Drug Laboratory, which is customarily used by the State Police for analysis. A subsequent report by two chemists with Arkansas Food and Drug found the pills to be amphetamines and amobarbitals. Sgt. Atkinson testified that he paid $7.11 to Mrs. Kimbell, and received a receipt for that amount.

The witness stated that on December 3, 1969, he made another purchase from a lady on duty, asking for a refill of the prescription of August 8. He did not have the bottle nor a signed receipt. The lady filled that prescription, and he then asked her for some quarter, or half, grain codeine pills for headaches. She also filled that prescription, stated that Dr. Grimmett would sign the prescription pad at a later date. Sgt. Atkinson received twenty-four codeine pills, and paid $12.30, apparently for both prescriptions. He said these pills were also identified by the above mentioned laboratory as Dexamyl amphetamines and codeine phosphate.

-Atkinson testified that on January 27, 1970, he went back to the clinic, Mrs. Kimbell being in charge, and she again made a sale of amphetamines to him. He requested additional codeine tables for headaches and "hang over" and she also furnished that.

Woodrow Little, an Investigator for the Arkansas State Medical Board, also, on this occasion, made two

6

purchases, in the presence of Sgt. Atkinson, these drugs later being identified by the chemists as Overdrin LA, a controlled drug.

Atkinson testified that Dr. Grimmitt had never examined him, and that on the night of the arrest of Grimmett, made on January 27, the doctor admitted that he had never before seen Atkinson. Little also testified that he was never examined by Grimmett, and had never been to the doctor as a patient. Little's testimony reveals that he had been observing Grimmett's Clinic for about two years, and had been there seven times posing as a detail man.[2] Little said that he would sit in the clinic and would observe people bringing in empty bottles and asking for pills and would then observe the ladies working in the clinic delivering pills to customers. Grimmett testified that he had examined Atkinson "some time last summer" when Atkinson came in as a patient, and that he had prescribed Dexamyl spansules for him. He denied that he had admitted to Atkinson on the occasion of his arrest that he had never seen the sergeant before. He also testified that Little had never bought any drugs from his clinic to his knowledge.

A handwriting expert testified that the ledger page for August 8, 1969, reflected that Pat Kimbell had made an entry reflecting a sale to Dale Attwood, and that entries immediately under this particular entry were made by Dr. Grimmett. Similar testimony was offered concerning other transactions, and it is difficult to believe that the doctor would not have noticed the entry made by Mrs. Kimbell when making his own entries.

Ark. Stat. Ann. § 72-604 (Repl. 1957) defines the practice of medicine as follows:

"(1) The term 'practice of medicine' shall mean: (a) holding out one's self to the public within this state as being able to diagnose, treat, prescribe for, palliate or prevent any human disease, ailment, injury,

---

[2]He never went when Grimmett was present.

deformity, or physical or mental condition, whether by the use of drugs, surgery, manipulation, electricity, or any physical, mechanical or other means whatsoever; (b) suggesting, recommending, prescribing or administering any form of treatment, operation or healing for the intended palliation, relief, or cure of any physical or mental disease, ailment, injury, condition or defect of any person with the intention of receiving therefor, either directly or indirectly, any fee, gift, or compensation whatsoever; * * *"

Appellee says there is no evidence that Mrs. Kimbell performed the acts heretofore related with the intention to receive "any fee, gift, or compensation". The short answer to this contention is that the testimony reflects that she did receive compensation for the drugs furnished Atkinson and Little. It is also argued that it is not shown that Mrs. Kimbell was not licensed as a nurse. Mrs. Kimbell did not testify, and while, if she were licensed as a nurse, it would appear that some mention of that fact would have been made during the course of the evidence, her status or lack of status as a nurse is immaterial to the disposition of the matter before us. Ark. Stat. Ann. § 72-729 (Supp. 1969), subsection d, states:

"The practice of professional nursing means the performance for compensation of any acts in the observation, care and counsel of the ill, injured or infirm or in the maintenance of health or prevention of illness of others, or in the supervision and teaching of other personnel, or the administration of medications and treatments, *as prescribed by a licensed physician,* [Our emphasis] or dentist; requiring substantial specialized judgment and skill and based on knowledge and application of the principles of biological, physical and social science. *The foregoing shall not be deemed to include acts of diagnosis or prescription of therapeutic or corrective measures.* [Our emphasis]"

Mrs. Kimbell's acts went beyond nursing care. Let it be remembered that the testimony reflects that she

took Sgt. Atkinson's blood pressure, and told him that it was too high for him to purchase amphetamines, but after being told that he had been drunk at a party, agreed that that would account for it, and made the sale. Further, when Atkinson asked her for codeine pills for relief of his headaches, she furnished the pills to him, taking pay. As previously stated, there is evidence that Dr. Grimmett was aware that employees were making sales. The facts testified about constituted substantial evidence that Dr. Grimmett was aiding and abetting an unlicensed person to practice medicine.

Ark. Stat. Ann. § 72-613 (Supp. 1969) provides that the board may revoke or suspend a license to practice medicine for *inter alia* violation of the laws of the United States or the State regulating the possession, distribution or use of narcotic drugs, or drugs, the sale and distribution of which is regulated by the Arkansas Barbiturate and Benzedrine Law.

The Arkansas Drug Abuse Control Act, Ark. Stat. Ann. § 82-2101 *et seq* (Supp. 1969) defines various types of drugs. Among other definitions appear the following:

"(d) The term 'depressant or stimulant drug' means:

(1) Any drug which contains any quantity of (A) barbituric acid or any of the salts of barbituric acid;* * *

(2) Any drug which contains any quantity of (A) amphetamine or any of its optical isomers; (B) any salt of amphetamine or any salt of an optical isomer of amphetamine; * * * "

Under authority of a court order, Grimmett was arrested and the premises searched for drugs. Officer Atkinson, Mr. Little, Kenneth (Phillip) Melancon, employed by the Bureau of Narcotics and Dangerous Drugs, and William H. Hogue, an employee of the Food and Drug Division of the Arkansas State Health Department, all participated in the search. An attorney for Grimmett

was also present while the stock of drugs was being inventoried. The officers found drugs in almost every room in the building, locating them in all types of containers, including coffee cans and orange juice bottles. They were not under lock and key. Apparently, labels which had been taken from samples of various drugs which the doctor had received, had been taken from the samples and placed on whatever container was used as a matter of identifying the particular drugs in that container. The labels taken from the samples would show that a few doses had been included in the sample, but some of the containers held several thousand pills or tablets.[3] Hogue said that many of these were controlled drugs. The inventory revealed a total of 1,812,-976[4] dosages of drugs at the time Grimmett was arrested. Mr. Melancon testified that Grimmett had over 300,000 dosages of Fiorinal, which is a controlled drug containing barbiturates. Sgt. Atkinson testified that Grimmett himself stated upon being arrested that he (Grimmett) doubted if he could come within a million of the actual drugs on hand due to the fact that they were physician's samples. The fact that tabs from the samples had been placed on containers holding hundreds or thousands of pills is, of course, a clear indication that these sample drugs were being sold. Melancon testified that Grimmett made the statement that most of his money came from the dispensing practice and if he

---

[3]From the testimony of Mr. Hogue: "A number of these drugs have monograms on the tabs from the manufacturer and a number of these bottles contained a small label for instance taken from a physicians sample package the label says 'four tabs or four caps of physicians samples' and this small label would be taken and put onto a container of a gallon coffee can or half gallon can or orange juice bottle or container other than the original package. This would constitute mislabeling and misbranding for a number of these sample packages. * * * These small labels have on each label each physicians sample package 'control or lot number of that particular drug'. As you know, a thousand, two thousand, fifty or what not broken down from packages that originally contained four or six samples constitute a number of different lot or control numbers over a period of time."

[4]This figure was taken from the brief. A tabulation compiled on an adding machine, from exhibits in the record, reveals 1,834,052.

didn't have his dispensing practice, he didn't want to operate. Under the provisions of Art. Stat. Ann. § 82-2107 (Supp. 1969), every person engaged in manufacturing, compounding, processing, selling, delivering or otherwise disposing of any depressant or stimulant drug shall, upon the effective date of the Act (June 29, 1967), prepare a complete and accurate record of all stocks of each drug on hand and shall keep such record for three years. Mr. Hogue testified that Grimmett told him that he had not made this inventory of amphetamines and barbiturates in 1967, and the testimony reflected that there were as many as 3000 controlled drugs in some of the containers found in the clinic. The testimony is somewhat confusing in that Sgt. Atkinson stated that Grimmett later produced an inventory; however he stated that this inventory "carried prices but no quantities". Be that as it may, it is very clear that whatever inventory there might have been did not come close to covering all the drugs in the possession of Grimmett.

Ark. Stat. Ann. § 82-1005 (Supp. 1969) requires that a written order for any narcotic drug shall be signed in quadruplicate by the person giving the order, or his duly authorized agent. The section provides what shall be done with these copies, including a requirement that one should be sent to the State Health officer not later than the 10th of the month following the month during which the order was made. In event the order is filled, there is a further requirement that each party shall preserve his copy of the order for a period of two years in such a way for it to be readily accessible for inspection by any public officer or employee engaged in the enforcement of the act. Mr. Hogue testified that Grimmett did not have such a complete and accurate record of drugs received by him. "Some of his order forms that he has to mail in when he places an order for narcotic drugs were missing. We have not received all order forms on orders he had placed". It would appear from this testimony that Hogue checked copies of drug orders found in Grimmett's office with files at the State Health Department, thus making his determination that copies

had not been sent to the Health Department. Appellee makes a vigorous attack upon this evidence,[5] and we agree that Mr. Hogue could have been much more definite and specific in his testimony, explaining exactly how he knew that this provision of the law had not been complied with, and offering into evidence whatever exhibits supported his testimony.

Ark. Stat. Ann. § 82-1009 (Supp. 1969), provides:

"Every physician, dentist, veterinarian, or other person who is authorized to administer or professionally use narcotic drugs, shall keep a record of such drugs received by him, and a record of all such drugs administered, dispensed, or professionally used by him otherwise than by prescription. * * *"

Mr. Hogue testified that he could not find complete records of the dispensing of drugs. Appellee complains that Hogue did not even bother to produce "an inaccurate and incomplete record for the inspection of the Board". Of course, Mr. Hogue's testimony was that he could not find a complete record and, after all, if such a record existed, only Grimmett, or those to whom he had confided, would know where to locate such a record. Certainly, though the over-all burden was on the complainants to establish their case, Dr. Grimmett had the opportunity to present records of compliance

---

[5]From appellee's brief: "This is not substantial competent evidence because (1) all we have is his naked word, (2) there is no evidence to show how these records are received, filed, stored, etc., by the Health Dept. so the conclusion that Mr. Hogue's Dept. *lost* the records could be as easily drawn as the conclusion that Dr. Grimmett did not mail them in as required, (3) 'some of them were missing' is so vague and indefinite no conclusion can be drawn, (4) the witness did not say *which* ones are missing, so appellee had no opportunity to make specific rebuttals to Mr. Hogue's assertions, (5) the records that had been sent were not produced at the hearing so Appellee could not ascertain by inspection which, if any, of the records were missing, and for that matter, (6) if they are missing, how does Mr. Hogue KNOW they are missing. No foundation whatever has been laid in the record that could lend credibility to the testimony on this point."

with the law, and it would seem that one so charged would very quickly do so—if such records existed. He did testify briefly, though he reserved the right to claim the privilege granted under the Fifth Amendment to the Federal Constitution, and actually did invoke the protection of that Amendment at one point.

Witnesses Hogue, Atkinson, and Melancon all testified that the cabinets containing the drugs were not locked as required, some narcotics even being on the shelves. Appellee says that the Statute (Ark. Stat. Ann. § 82-1025 [Supp. 1969]), which requires that narcotic drugs be kept in a safe or other receptacle equipped with a lock sufficient to secure such narcotic drugs against theft, only applies to a licensed pharmacist. There is no necessity for us to go into the requirements of the state's statutes relative to this subject for it has been previously pointed out in this opinion that subsection (5) of Ark. Stat. Ann. § 72-613 provides that violation of the laws of the United States, as well as state laws, regulating possession or use of narcotic drugs, constitutes "unprofessional conduct", and is a ground for revocation of a medical license. 26 CFR 151.471, under the topic, "Safeguarding of Narcotics" states that *"Narcotic drugs and preparations shall at all times be properly safeguarded and securely kept* (our emphasis) where they will be available for inspection by properly authorized officers, agents, and employees of the Treasury Department and the Department of Justice".

The testimony makes clear that the drugs under discussion were neither "safeguarded" nor "securely kept".

In addition to the violations heretofore discussed, the board found Grimmett guilty of failing to possess the moral character requisite for the proper practice of medicine. This finding was based upon the testimony of three young women, all of whom testified that they had been patients of Dr. Grimmett; that he had prescribed for them various drugs, and had made advances to them. Two of the women testified that they had sexual relations with Dr. Grimmett, the third testifying

that the doctor had endeavored to have relations with her. All testified that he consistently prescribed different drugs and one was finally committed for treatment as a drug addict. Dr. Grimmett admitted sexual relations with one of these women, although he stated that he did not recall whether this occurred while she was a patient or after she was a patient, but he denied the testimony of the other two. Admittedly, he also had fathered an illegitimate child by still another woman, while married and living with his wife.

It is strenuously argued by appellee that, though there is a requirement that one possess good moral character before being licensed to practice, there is no statutory authority for the board to revoke a license because of immorality.

This opinion is already lengthy, and the facts previously enumerated (disregarding the charge of immorality) are, we think, clearly sufficient to sustain the findings and order of the board. Accordingly, no good point would be served by discussing this particular charge.

Some dozen witnesses, residents of the area in which Dr. Grimmett has practiced, testified in his behalf, stating that their association with the doctor as patients had been pleasant and without any flaw; some said that they had tried to get drugs refilled but were unable to do so. Several mentioned various courtesies that had been extended, and one related that when called to the patient's home, the doctor took his shoes off in order to keep from tracking up the rug. Other persons said that the people in the community needed his services. Of course, in a case of this nature, this is what might be termed "negative" evidence. For the fact that he did not act in the manner, heretofore discussed, with these particular patients, in nowise disproves the evidence already mentioned; the witnesses, after all, were only saying that no violations occurred during their contacts with the doctor.

We think the evidence relating to the violations of drug laws was very convincing, and apparently the trial court was likewise of the view that, at least, the testimony relating to the drugs was true, for in its judgment providing that Dr. Grimmett could continue to practice, a proviso was inserted that the doctor could not maintain any stock of any drug that was subject to regulations under the Arkansas Uniform Narcotic Drug Act and the Arkansas Drug Abuse Control Act; nor legend drugs under the Federal Food and Cosmetology Act (except for a supply of emergency drugs for personal office use not exceeding a supply normally stocked by a non-dispensing physician).

We do not agree with the trial court that the action taken by the board was "harsh", "severe", or "drastic"; in fact, from the evidence introduced, and entirely aside from the question of possession the requisite moral character to practice, we are of the opinion that the board's order was not only justified, but rather restrained. Dr. Grimmett's license was not revoked, and the suspension was not for a particular period of time. To the contrary, Grimmett was given the opportunity to present, at the next regular meeting of the board, any relevant evidence which might cause the board to reconsider its action to reinstate his license. The order of the board specifically provided that the hearing was not closed, but should be continued, subject to the request of Grimmett or his attorney to appear and present other evidence. Thus, appellee still has the right, if he so desires, and can furnish additional evidence of extenuating circumstances, to take this step.

There was substantial evidence to support the action of the Board, and it follows from what was said in *McCain, Labor Commissioner* v. *Collins supra* that the Court erred in entering the judgment appealed from.

Accordingly, it is the order of this Court that the judgment of the Pulaski County Circuit Court is re-

versed, and the cause is remanded with directions to reinstate the order of the board.

It is so ordered.